IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

William Stanfield,                        Case No. 3:15 CV 2263

               Plaintiff,         MEMORANDUM OPINION
                                 AND ORDER

     -vs-

City of Lima, et al.,                    JUDGE JACK ZOUHARY

               Defendants.

### INTRODUCTION

Plaintiff William Stanfield had too much to drink on the night of October 4, 2013, when he was driving in the City of Lima in his white RV. A police patrol observed him shortly after receiving a report from Dispatch about a suspected drunk driver in a white RV. The patrol followed Stanfield, who pulled into a vacant lot owned by him. He was then arrested for drunk driving. Before he was handcuffed, however, there was an altercation with three police officers. That altercation forms the basis for this lawsuit.

Stanfield sued the City of Lima, its Police Chief Kevin Martin, and the officers who arrested him -- Bryce Garman, Aaron Montgomery, and Aaron Rode. Stanfield alleges excessive force was used during the arrest. Defendants argue their use of force was reasonable. They also argue on summary judgment that they are protected by qualified immunity.

The matter has been fully briefed (Docs. 39–40, 46–47). In addition, a record hearing was held (Doc. 43), during which a dash-cam video (Docs. 38) was played and discussed.

**UNDISPUTED FACTS**

On October 4, 2013, around 10 PM, Montgomery and Rode were on patrol when they observed Stanfield, a 68-year-old man, driving a white RV (Doc. 36-1 at 9).  Soon after, they received a report from Dispatch about a suspected drunk driver in a white RV (Doc. 33-1 at 4; Doc. 36-1 at 9).  Montgomery and Rode caught up with the RV and asked Garman, who was patrolling nearby, to assist with further observation (Doc. 33-1 at 4; Doc. 36-1 at 10).  After Garman reported that the RV pulled into a vacant lot, which was owned by Stanfield, Montgomery and Rode conferred and decided Garman should approach the RV to investigate potential criminal activity (Doc. 33-1 at 5; Doc. 34-1 at 6; Doc. 36-1 at 12).

Garman approached the RV and asked Stanfield to step outside (Doc. 33-1 at 6–7).  Stanfield showed Garman a badge but did not say anything (*id.*).  The officers later determined Stanfield carried the badge because he was a retired corrections officer, though Garman initially thought the badge was associated with a concealed-carry permit (Doc. 33-1 at 7).  This prompted him to ask Stanfield whether he had such a permit, and Stanfield replied "yes" (*id.*).  Stanfield did not, in fact, have a permit (Doc. 35-1 at 37).  Garman again asked Stanfield to exit the RV, and Stanfield complied (Doc. 33-1 at 7).  Montomery and Rode then arrived on the scene (Doc. 35-1 at 197).

A portion of the interaction between Stanfield and the officers was recorded by the dashboard camera on Garman's patrol car, as well as by body microphones worn by Montgomery and Rode.  According to the sworn transcript of the audio and video prepared by Stanfield's attorney (Doc. 35-1 at 192–206), which Defendants now accept as accurate for purposes of this Motion (Doc. 47 at 2 n.1), it is undisputed the following events and dialogue occurred over the span of a minute and a half, with Stanfield standing outside his RV surrounded by the three officers (Doc. 35-1 at 192–206):

2

| Time | Description |
|------|-------------|
| 22:33:34 | Stanfield opens the door to his RV and speaks with Garman. |
| 22:33:48 | Rode appears on camera. |
| 22:33:50 | Stanfield exits the RV. |
| 22:33:53 | Montgomery appears on camera. |
| 22:34:01 | Unknown Officer: "Can you keep your hands out of your pocket for me?  Do you have anything on your person right now?" |
| 22:34:03 | Stanfield: "No." |
| 22:34:05 | Garman: "Have you been drinking?" |
| 22:34:08 | Stanfield: "What makes . . ." |
| 22:34:09 | Garman: "Have you been drinking?" |
| 22:34:10 | Stanfield: "What makes the difference?" |
| 22:34:11 | Garman: "Well, you were just driving your RV around town, that makes a difference." |
| 22:34:15 | Unknown Officer: "You can't drink and drive." |
| 22:34:18 | Unknown Officers: "Sir, keep your hands out of your pockets." "Damn, how many times now?" |
| 22:34:20 | Stanfield: "Now listen, I'm not gonna . . ." |
| 22:34:21 | Garman: "I'm gonna pat you down real quick.  Alright man." Garman places Stanfield's left hand on his head. |
| 22:34:23 | Unknown Officer: "Just relax, sir." Garman places Stanfield's arms behind his back. |
| 22:34:23 | (Simultaneous talking) Stanfield: "Hey, wait a minute.  Don't do this." Unknown Officer(s): "Relax.  Relax." |
| 22:34:26 | Stanfield steps forward; Montgomery then trips Stanfield from behind and causes him to fall to the ground. |
| 22:34:28 | Garman and Montgomery begin to wrestle with Stanfield on the ground. |
| 22:34:37 | Unknown Officer: "Keep your hands behind your back." |
| 22:34:39 | Unknown Officer: "Give us your hands. Give us your hands." |

3

| 22:34:41 | Stanfield: "Quit. Quit." |
|---|---|
| 22:34:44 | Unknown Officer: "Put your hands behind your back." |
| 22:34:46 | Unknown Officer: "Put your hands behind your back." |
| 22:34:50 | Stanfield: "I can't. Quit (kneeing or beating) me. God damn." |
| 22:34:55 | Rode delivers two strikes with his flashlight to Stanfield's legs. |
| 22:34:58 | Unknown Officer: "We got him.  We got him.  Get him cuffed.  Get him cuffed." |
| 22:35:04 | Unknown Officer: "You watching that car, that RV?  He's got a concealed carry permit.  I'm sure he ain't got the gun on him." |
| 22:35:08 | Montgomery searches Stanfield's pockets, while Stanfield lies on the ground. |

While wrestling with Stanfield on the ground, Montgomery and Garman each employed "muscling techniques" to try to gain control of Stanfield's hands (Doc. 34-1 at 9; Doc. 36-1 at 21). Garman also delivered at least two knee strikes -- one of which broke Stanfield's rib (Doc. 33-1 at 11–12; Doc. 35-1 at 12, 66, 81–82).  Rode's use of force was limited to the two flashlight strikes he delivered to Stanfield's calf (Doc. 35-1 at 198).  After the officers cuffed him, Stanfield was arrested for, among other things, operating a vehicle under the influence and resisting arrest (Doc. 35-1 at 199).  The charges against him were eventually dropped after the state court granted a motion to suppress evidence from Stanfield's encounter with the officers (Doc. 15 at ¶¶ 28–29, 61).

Stanfield acknowledges he was intoxicated during the incident (Doc. 35-1 at 15), and the breathalyzer administered by the police showed he had a blood-alcohol level of .141 (Doc. 35-1 at 191).  The hospital records where Stanfield was treated for his injuries showed a blood-alcohol level of .170 (Doc. 35-1 at 87).  Those records also noted injuries to Stanfield's face and ribs (Doc. 35-1 at 81–82).  Specifically, he had "swelling, contusion/redness around inner aspect of his left occular periorbital region going to his left cheek/maxillary region" and a "seventh left rib fracture" (*id.*).

4

### DISPUTED FACTS

The parties dispute whether Stanfield resisted the officers' attempts to pat him down and place him under arrest.  After informing Stanfield they intended to pat him down, the officers tried to place Stanfield's hands behind his back (Doc. 35-1 at 197–98).  When one of the officers told Stanfield to relax, Stanfield replied: "Hey, wait a minute.  Don't do this" (*id.*).  The video then shows his right arm pulling away from the officers (Doc. 38 at 22:34:25–26).

Stanfield argues this movement resulted from his intoxication and lack of balance (Doc. 40 at 2; Doc. 46 at 5).  Defendants counter that Stanfield intentionally pulled away from them to avoid the pat down.  Montgomery testified Stanfield "actively resist[ed]" by pulling and manipulating his body to prevent the officers from patting him down (Doc. 36-1 at 19).  He also testified Stanfield pulled his hands from behind his back toward the front of his body (*id.*).  Garman testified "Stanfield started to tense up and tried to pull his arms away from us" (Doc. 33-1 at 10).  Stanfield does not recall pulling away, or other details of the incident, perhaps due to his intoxication (*see* Doc. 35-1 at 38–39).

The parties also dispute whether Stanfield placed his whole hands in his pocket or only his thumbs.  Stanfield admits he put his thumb in his pocket at least twice, despite being told not to (Doc. 35-1 at 35).  But Montgomery and Rode testified Stanfield put his entire hand in his pocket (Doc. 34-1 at 8; Doc. 36-1 at 14, 16).  Garman also testified Stanfield placed his fingers -- not just his thumb -- in his pocket, but he was not sure how deep his fingers reached into the pocket (Doc. 33-1 at 9).  The position of Stanfield's hands is not recorded or visible on the video.  The audio recording reveals Stanfield told the officers he had nothing in his pockets -- and, indeed, nothing was later found.

5

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact," and the moving party "is entitled to judgment as a matter of law."  Federal Civil Rule 56(a).  This Court must draw all inferences from the record in the light most favorable to Stanfield, unless clearly contradicted by the video or audio evidence.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hayden v. Green*, 640 F.3d 150, 154 (6th Cir. 2011).  Further, this Court may not weigh the evidence or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## STANDARDS FOR EXCESSIVE FORCE AND QUALIFIED IMMUNITY

A police "officer making an investigative stop or arrest has 'the right to use some degree of physical coercion or threat thereof to effect it.'"  *Miller v. Sanilac Cnty.*, 606 F.3d 240, 251 (6th Cir. 2010) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  But that does not carry with it a license to inflict "gratuitous violence."  *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009).  Force that is unreasonable or excessive violates the Fourth Amendment's prohibition on unreasonable seizures.  *See Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 851 (6th Cir. 2016).

Nevertheless, the doctrine of qualified immunity shields government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (internal quotations omitted).  Thus, in assessing claims against police officers alleged to have used excessive force, this Court must conduct a two-step inquiry: (1) whether constitutionally excessive force was used; and (2) whether the officer is entitled to qualified immunity.  *See Saucier v. Katz* , 533 U.S. 194, 200–01 (2001); *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).  This

6

Court may address either inquiry first, in "light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The first inquiry, whether force is constitutionally excessive, depends on whether, "under the totality of the circumstances, the officer's actions were *objectively* reasonable." *Fox v. DeSoto*, 489 F.3d 227, 236–37 (6th Cir. 2007) (emphasis added). This is a question of law that must be decided by a court, and it requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [t]he [suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see Scott*, 550 U.S. at 381 & n.8 ("At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . the reasonableness of [the officer's] actions . . . is a pure question of law."). This Court must consider each factor "from the perspective of a reasonable officer on the scene," and may not engage in second-guessing through hindsight. *Graham*, 490 U.S. at 396.

The second inquiry, whether qualified immunity shields an officer from suit, depends on whether, at the time of the incident, "the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. This does not necessarily "require a case directly on point," but "existing precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015)). Thus, before a court may deny qualified immunity on claims of excessive force, it must first "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* at 552. Officers cannot be held liable "for mere negligence" in determining the appropriate amount of force

to use in a given situation, because "the law does not lightly subject officers to liability after the fact for doing a dangerous job that often requires split-second judgments in complicated, quickly evolving criminal investigations." *Ortiz*, 811 F.3d at 851. Qualified immunity therefore "protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551 (quotations omitted); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.") (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

### ANALYSIS

Each officer's liability must be assessed individually and based on his own actions. *See Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015); *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Thus, this Court will address Stanfield's claims against each officer in turn, but first will discuss the cases and principles that apply equally to each officer. In order to determine whether force was constitutionally excessive, this Court must examine three factors identified in *Graham*: (1) the severity of Stanfield's crime; (2) the threat posed by Stanfield; and (3) whether Stanfield was attempting to resist or evade arrest. *See* 490 U.S. at 396.

Stanfield was followed based upon Dispatch's report of a suspected drunk driver, but the officers themselves did not observe erratic driving. The Sixth Circuit generally considers drunk driving to be a crime of moderate to serious severity, even though it typically is a misdemeanor for a first-time offender. *See Laury v. Rodriguez*, 659 F. App'x 837, 843 (6th Cir. 2016) ("Laury was arrested for operating a vehicle while intoxicated and possession of Ecstacy—'not a severe offense that would support a greater use of force.'") (quoting *Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006)); *McColman v. St. Clair Cty.*, 479 F. App'x 1, 6–7 (6th Cir. 2012) (approving a district

8

court's characterization of drunk driving as "an unquestionably serious crime which can, under certain circumstances, lead to a volatile situation"); *Marvin v. City of Taylor*, 509 F.3d 234, 245 (6th Cir. 2007) ("Drunk driving is substantially more serious than the offense of trespassing [which was] found sufficiently minor to weigh against the objective reasonableness of the officer's actions in [another] case."); *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004) (characterizing drunk driving as a crime that is "moderate in severity" and noting that a suspect could pose a danger to others if allowed to flee). In the context of this case, the officers had little reason to believe Stanfield was a violent offender or that he would flee. Thus, this Court finds the severity of Stanfield's crime was moderate, at worst, and would not suggest that a severe level of force was warranted to effect an arrest.

With respect to the danger Stanfield posed to the officers, there are two key issues informing this Court's analysis. First, this Court does not believe the officers reasonably feared Stanfield was reaching for a gun. Although they testified Stanfield acknowledged having a concealed-carry permit (*e.g.*, Doc. 33-1 at 7), the record, when read in the light most favorable to Stanfield, suggests the officers did not believe he was armed. As an initial matter, Stanfield told the officers he was not carrying a weapon (Doc. 35-1 at 197) (Q: "Do you have anything on your person right now?" A: "No."). And while the officers were not required to believe him, there is evidence suggesting they did. After Stanfield was cuffed, but before his pockets were searched by Montgomery, one of the officers stated: "You watching that car, that RV? He's got a concealed carry permit. *I'm sure he ain't got the gun on him*" (Doc. 35-1 at 198) (emphasis added). Moreover, Stanfield testified he only placed his thumbs in his pockets -- not his entire hands. There was no testimony the officers saw a visible bulge in Stanfield's pocket indicating a weapon. Thus, when viewed in the light most

9

favorable to Stanfield, the officers could not reasonably have feared Stanfield was armed and reaching for a weapon, as might justify using severe force.  This situation is therefore distinguishable from *Pollard*, where officers were told the suspect had a concealed-carry permit and "did not and could not have known" the suspect was unarmed.  *See* 780 F.3d at 403.

The next issue informing this Court's consideration of the threat posed by Stanfield is his age and level of intoxication.  At the time of his arrest, Stanfield was 68 years old and heavily intoxicated.  As such, he did not appear to pose much of a threat to the safety of three much younger officers, nor did he pose a reasonable threat of fleeing.  The Sixth Circuit has cautioned, however, that because intoxicated persons can create a volatile situation, elderly people who are intoxicated may still pose a threat to younger arresting officers.  *See Marvin*, 509 F.3d at 246 ("In the abstract, it is easy to say that [the suspect] posed little threat to [the officer] or others, but it is important to keep in mind that [the suspect's] heavy intoxication created a volatile situation. . . . [I]t does not necessarily follow that [the suspect] posed little threat to the officers at the scene simply by virtue of his advanced age as contrasted with the officers' youthful brawn."); *but see Solovy v. Morabito*, 375 F. App'x 521, 525 n.4 (6th Cir. 2010) ("While heavy intoxication may, on its own, render it reasonable to handcuff an individual, the reasonableness of the force used to effectuate the seizure of the individual in order to handcuff him will generally depend upon other circumstances, such as the individual's resistance and hostility.  The mere fact of intoxication does not justify gratuitous violence.").  Under the circumstances of this case, including Stanfield's behavior up to the point of the tackle, there was no reason for the officers to suspect Stanfield posed a significant threat of violence, warranting a severe physical response.

Finally, the third factor this Court must consider is the extent to which Stanfield resisted arrest. Ordinarily, this Court must accept Plaintiff's version of events for purposes of summary judgment. Here, however, it is clear Stanfield does not remember precisely what happened that night. And, in any event, he does not specifically deny resisting the officers' attempts to pat him down (*see* Doc. 35-1 at 37–39). In contrast, Garman and Montgomery each testified unequivocally that Stanfield actively resisted their attempts to pat him down, culminating in his intentionally pulling away from them. The video confirms that Stanfield swung his arm away from the officers just before he was tackled.

Stanfield's *argument* that his arm pulled away because he lost his balance is not determinative. *See Rudlaff*, 791 F.3d at 642 ("His purported subjective intent to comply with the officers' requests fares no better, for we view his actions *objectively*, from the perspective of a reasonable officer at the scene."). The video is not conclusive as to whether Stanfield pulled away intentionally or whether he merely stumbled, although this Court notes the allegations in Stanfield's Complaint suggest it was intentional (Doc. 15 at ¶ 18) ("Surprised by Garman's aggression, Mr. Stanfield attempted to regain control of the arm Garman had grabbed. Montgomery then tripped Mr. Stanfield . . ."). Regardless, given that Stanfield pulled away from the officers as they were attempting to pat him down, this Court cannot conclude it was objectively unreasonable for an officer at the scene to view his conduct as "active resistance." *See Rudlaff*, 791 F.3d at 641 ("Active resistence includes physically struggling with, threatening, or disobeying officers. And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance.") (internal quotations and citations omitted). There is no "*de minimis* resistance exception" that would "prohibit the police from using force if a jury decided that the suspect only *kind of* resisted arrest." *Id.* at 643. Accordingly, "[w]hen a person resists arrest—say, by swinging his arms in the officer's direction,

11

balling up, and refusing to comply with verbal commands—the officers can use the amount of force *necessary* to ensure submission." *Id.* (emphasis added); *but see Martin v. City of Broadview Heights*, 712 F.3d 951, 959 (6th Cir. 2013) ("The Fourth Amendment's protections do not evaporate the moment an individual resists an officer's command.").

Weighing all the *Graham* factors -- the moderate severity of the suspected crime, the minimal threat posed, and the possible resistance to officers' attempts to pat him down -- this Court finds it was not objectively unreasonable to use some degree of force to restrain Stanfield. The more difficult question is whether the degree of force employed by the officers was excessive under the circumstances. *See Martin*, 712 F.3d at 958 ("[T]he question is not whether any force was justified. It is, instead, whether [the officers] could reasonably use the *degree* of force employed against [the suspect]."); *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) ("[T]he Fourth Amendment governs more than just '*when*' force may be applied; it also governs '*how* [that force] is carried out'" (quoting *Graham*, 490 U.S. at 395)).

**Officer Montgomery**

Stanfield alleges Montgomery applied excessive force by tackling him and using "muscling techniques" to get Stanfield's hands behind his back while he was on the ground. This Court concludes it was objectively reasonable to attempt to force Stanfield's hands behind his back once he refused to comply with the officers' commands to produce his hands for cuffing. *See Marvin*, 509 F.3d at 247 ("[T]he Defendants did not violate [the plaintiff's] constitutional rights when they forced a drunk suspect, who had just crashed his vehicle into another, and who was resisting arrest, into a submissive posture in order to handcuff him behind his back so as to immobilize his hands and arms."). Montgomery's liability thus rests with his initial decision to tackle Stanfield.

12

Unfortunately, Sixth Circuit cases do not provide concrete guidance on this issue.  Can an officer tackle a suspect who resists attempts to pat him down or restrain him?  The answer, of course, is "it depends."  But it is not always clear on what, precisely, that answer depends.

In *Lawler*, the Sixth Circuit addressed circumstances fairly similar to those at issue here.  A suspected drunk driver, while being booked into jail, objected to being told to turn around and put his hands on the counter.  268 F. App'x 384, 386 (6th Cir. 2008).  Videotape showed the suspect raised his hands slightly off the counter, at which point the officer tackled him, "struggled with him for a few moments and struck him forcefully three times" before cuffing him.  *Id.* at 387.  The strikes included two knee strikes and an elbow, one of which broke the suspect's arm.  *Id.*  Although the court noted the suspect's resistance to being handcuffed and recognized the officer was entitled to use "*some* force to compel [the suspect's] cooperation," it nevertheless held that "a jury fairly could find that [the suspect] never posed a threat to [the officer's] safety (making [the officer's] take-down excessive) and could find that he was not a threat once he hit the floor (making [the officer's] knee strikes and elbow jab gratuitous)."  *Id.*

Based on Sixth Circuit and Supreme Court precedent, this Court understands the issue to be not whether a *jury* could reasonably conclude the suspect posed no threat to the officer; but whether a *court* can conclude it was *objectively unreasonable* for the officer to view the suspect as a threat and act accordingly.  *See Scott*, 550 U.S. at 381 & n.8 ("At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . the reasonableness of [the officer's] actions . . . is a pure question of law.") (emphasis in original).  *Miller*, 606 F.3d at 251 ("Claims of excessive force are

13

analyzed under an objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene.").

In *Malory v. Whiting*, the Sixth Circuit again addressed a situation where a booking officer was accused of using excessive force. 489 F. App'x 78, 84 (6th Cir. 2012). *Malory* involved an officer who allegedly "slammed Plaintiff to the ground and drove his knee into Plaintiff's temple" while another officer "stepped on Plaintiff's hand and punched him in the ribs." *Id.* The court found a constitutional violation and denied qualified immunity, holding that the suspect's resistance was "sufficiently benign that a reasonable officer would have understood that it was unnecessary to tackle, step on, and punch [the suspect] to prevent him from acting violently toward the officers." *Id.* at 86. It was important to the court's analysis that the suspect's offense (driving without a license) was nonviolent and the suspect was cooperative with the officers up until the "benign" resistance at the booking counter (refusing to sign his name). *Id.* at 83. Thus, the court believed the officers had no reason to fear the suspect would react violently. *Id.*

In *Goodrich v. Everett*, the arrestee, who was suspected of domestic assault, drove away from officers after being ordered out of his car, avoided two police roadblocks, refused to pull over for officers pursuing him, and eventually drove to a police station in a nearby town. 193 F. App'x 551, 552–53 (6th Cir. 2006). After exiting his vehicle and walking toward the station, allegedly intending to surrender, he was "body slammed to the ground on the aggregate concrete," his face was pushed into a flower bed of mulch "as deep and as far as [the officers] could," and he was repeatedly kneed in the side. *Id.* at 553–54. His injuries included a broken and dislocated hip, a broken rib, and all the skin being torn off his knees. *Id.* The plaintiff testified that he did not resist arrest "in any form or fashion" other than refusing to stop his car for the officers. *Id.* at 554. Ultimately, the court rejected

14

his constitutional claim, holding that a reasonable officer would not believe the force used against him was excessive (*id.* at 557):

> Clearly, some force may be wildly disproportionate for the purpose of handcuffing a suspect, and may constitute excessive force regardless of whether a suspect has already been subdued.  Goodrich's testimony, however, does not allege a level of force or brutality that a reasonable officer would consider excessive.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment."  *Graham*, 490 U.S. at 396, 109 S. Ct. 1865 (internal citation omitted).  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."  *Saucier*, 533 U.S. at 205, 206.

In *Caie v. West Bloomfield Township*, police were asked to intervene in a potential suicide attempt.  485 F. App'x 92, 94 (6th Cir. 2012).  When confronted by the officers, plaintiff, a suicidal teenager, asked what he had to do to get them to shoot him.  *Id.*  Eventually, although not suspected of a crime, the officers decided they would have to physically restrain plaintiff in order to transport him to a hospital.  *Id.*  But plaintiff resisted the officers' attempts to grab him and attempted to flee. *Id.*  The officers eventually tackled him, and plaintiff pulled his arms under his body so they could not handcuff him.  *Id.*  Despite repeated requests to produce his hands, plaintiff refused.  *Id.*  The officers then tased him, at which point he "moved his arms from underneath his body and allowed officers to handcuff him."  *Id.*  The Sixth Circuit held there was no constitutional violation, finding that plaintiff was a danger, at least to himself.  *Id.*  at 96.  Moreover, the court rejected plaintiff's argument that using the taser was excessive because he was already subdued by the officers who tackled him (*id.* at 97):

> Although Plaintiff insists that he no longer posed a risk of harm or flight after being taken to the ground, there is no dispute that Plaintiff continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back.  In light of this resistance, we find that [the officer's] single use of the taser in drive-stun mode was not gratuitous.  Rather, it served the purpose of gaining control over a highly intoxicated, volatile, and uncooperative subject and neutralizing what a reasonable officer could perceive as a dangerous situation.

15

Finally, in *Rudlaff*, police arrested a suspect for driving with a suspended license.  791 F.3d at 640.  The suspect initially refused the arresting officer's instruction to place his hands on his truck, and the suspect twice jerked his hands away from the officer.  *Id.*  The suspect then "ball[ed] up" and refused to allow the officer to handcuff him.  *Id.*  After the first officer delivered an unsuccessful knee strike, another officer warned the suspect he would be tased if he did not comply.  *Id.*  The suspect ignored the warning, and the officer tased him.  *Id.*  The Sixth Circuit found no constitutional violation, and it acknowledged a "simple dichotomy."  *Id.* at 642.  "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot."  *Id.*  The court went on to state that because the suspect "actively resist[ed] arrest and refus[ed] to be handcuffed, a reasonable jury applying the law of our circuit could conclude only that the officers were constitutionally able to use the force they did to subdue him."  In addition, the court strongly rejected a *de minimus* resistance rule that would prevent officers from using such force if a suspect "only *kind of* resisted arrest."  *Id.* at 643.  The court rhetorically asked how such a rule would work and how long a suspect must be allowed to resist before an officer may take action.  *Id.*  Such a rule "does not provide the necessary guidance for the police, and it risks the safety of all involved."  *Id.*

In this Court's view, the above survey of Sixth Circuit authority shows how difficult it is to draw clear lines regarding the specific amount of force an officer may constitutionally apply to a suspect actively resisting arrest.  At the very least, each case is highly fact-specific, and meaningful distinctions can be drawn between this case and other cases.  Nevertheless, this Court is charged with evaluating the constitutionality of Montgomery's conduct against this backdrop.

16

*Montgomery's tackle was excessive*

This Court finds the following facts and distinctions persuasive to its analysis:

- The dash-cam video shows Stanfield was somewhat cooperative during his conversation with the officers, and he posed no serious threat to himself or others at that point.

- Stanfield did not verbally or physically assault the officers.

- The officers outnumbered Stanfield three to one and had him surrounded.

- The video does not clearly depict whether Stanfield was resisting the pat-down or, as he claims, stumbling forward.  Either way, he was not going far.

- Montgomery's take-down was not necessary to keep Stanfield from fleeing or acting violently toward the officers.

- Before escalating force, the Lima Police Department General Directives require officers to consider, among other factors: (1) the age and size of the officer and suspect; (2) the number of suspects needing control; (3) the intoxication of the suspect; (4) the availability of assistance; and (5) whether there is an imminent danger (Doc. 36-1 at 45–46).

- As in *Malory*, the officers had no reason to fear Stanfield would react violently.

- Unlike *Goodrich*, Stanfield did not lead officers on a car chase, avoiding roadblocks and refusing to pull over.

- Unlike *Caie*, the officers were not faced with an unstable, suicidal teenager who was attempting to flee.

Although an analysis of Sixth Circuit cases on this issue, particularly *Lawler* and *Malory*, suggests the force employed by Montgomery was objectively unreasonable, *Rudlaff* suggests even minimal resistance justifies tackling or kneeing a subject.  In other words, *Rudlaff* arguably draws a bright line permitting this type of force in the face of any "active resistance."  *See* 791 F.3d at 642. Under a broad reading of *Rudlaff*, Montgomery's tackle would not violate the Constitution as long as the officers reasonably believed Stanfield was actively resisting their attempts to restrain him.

17

But given the lack of clarity in this Circuit's precedent, it is not clear *Rudlaff* controls. Importantly, the suspect in *Rudlaff* admitted he resisted the officer's attempts to restrain him, and the court found the video in that case was unambiguous. *See id.* ("[P]ivotally, he admitted at his deposition that he tried to prevent [the officer] from handcuffing him—*i.e., he conceded that he resisted arrest.*"); *id.* at 640 ("[T]he knee strike did not succeed in subduing [the suspect], who still appeared to be struggling."). Further, the arresting officer in *Rudlaff*, who delivered the initial knee strike, knew the suspect had a history of "getting physical with police officers after being stopped." *Id.* Here, Stanfield neither admitted nor denied actively resisting arrest, and the video is ambiguous as to the nature and level of Stanfield's resistance. Moreover, the officers had no reason to suspect Stanfield would react physically. This court does not interpret *Rudlaff* to establish that severe force is justified whenever an officer reasonably believes a suspect is actively resisting arrest -- without regard to the other *Graham* factors.

Ultimately, weighing the *Graham* factors in the light most favorable to Stanfield, from the perspective of a reasonable officer on the scene, this Court concludes Montgomery's tackle was objectively unreasonable. A reasonable officer on the scene was required -- in accordance with the Lima Police Department General Directives -- to consider Stanfield's age, level of intoxication, and the fact that three much younger officers had him surrounded. Consequently, a reasonable officer would have concluded both that Stanfield posed no real threat and that his ambiguous resistance did not justify an aggressive tackle without warning. In this Court's view, Montgomery unnecessarily escalated a non-violent situation, resulting in the use of severe force against Stanfield. Thus, this Court concludes Montgomery violated Stanfield's constitutional rights.

*Qualified Immunity*

Even though this Court is troubled by Montgomery's response to Stanfield's alleged resistance, the doctrine of qualified immunity nevertheless shields him from suit because the law governing these circumstances is sufficiently unclear.  As the Supreme Court has instructed:

> [T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (internal quotations omitted); *see also Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403–04 (6th Cir. 2007) ("[I]n the excessive force context, it is not enough that a plaintiff establishes that the defendant's use of force was excessive under the Fourth Amendment.  To defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed.").

The parties have not cited, nor is this Court aware of, any published case in this Circuit that clearly proscribes the tackling of a suspected drunk driver who refuses to comply with officers' instructions and pulls away from them during an attempted pat-down.  Although the Sixth Circuit's unpublished opinions in *Lawler* and *Malory* are somewhat analogous, each is meaningfully distinguishable.  Importantly, each case involved a suspect who arguably resisted *booking*, not *arrest*.  An officer at booking is likely to encounter suspects who have been searched incident to their arrests (and are thus free of weapons).  Moreover, the chance of a suspect escaping from booking is more remote than the possibility of a suspect fleeing the scene of an arrest.  And because backup is more readily available to an officer in distress during booking, a potential threat faced by a booking officer is less perilous.  In short, just because a takedown or knee strike was deemed excessive during the

19

bookings in *Lawler* or *Malory* does not mean officers were given *clear notice* that a takedown or knee strike in the face of resistance during an *arrest* also would be unconstitutional.

Likewise, a reasonable officer could mistakenly conclude from cases like *Goodrich* and *Caie* that tackling or striking Stanfield would not violate the Constitution.  In *Goodrich*, the court described the knee strikes that broke a suspect's ribs as not rising to "a level of force or brutality that a reasonable officer would consider excessive."  193 F. App'x at 557.  The court did not qualify that statement as only applying to suspected violent offenders who sought to *evade arrest* by flight. Moreover, the brutality of a knee strike does not depend on the strike's target.  Consequently, a reasonable officer might mistakenly believe that *Goodrich* provides blanket authority to employ tackles or knee strikes against uncooperative subjects -- even those who are non-violent or are merely resisting, rather than evading, arrest.

Likewise, *Caie* might give a reasonable officer the mistaken impression that tackling Stanfield was constitutional.  In *Caie*, the teenager in question, who -- unlike Stanfield -- was not suspected of a crime, was tackled when he avoided officers' attempts to restrain him. 485 F. App'x at 94.  He was then tased without warning while arguably under the officers' control.  *Id.*  The court found no constitutional violation, and stated that the taser shot was objectively reasonable to gain "control over a highly intoxicated, volatile, and uncooperative subject."  *Id.* at 97.  The stakes were much higher in *Caie*, given the subject's suicidal statements and attempts to flee.  But there are enough similarities that a reasonable officer could mistakenly find that the case authorizes the tackling of a highly intoxicated subject believed to be resisting arrest.

Thus, while distinguishable under the circumstances, *Goodrich* and *Caie,* along with cases like *Lawler* and *Malory*, show how difficult it could be for an officer to discern the constitutionality of a tackle or knee strike against Stanfield -- a non-violent, non-threatening suspect who nevertheless

appeared to be resisting arrest. Although there were legal authorities at the time of the incident suggesting the officers' conduct *might be* unconstitutional, defeating qualified immunity requires more; it requires *clear notice* that the officers' conduct *would be* unconstitutional under the circumstances. *See Brosseau*, 543 U.S. at 198–99. The fact that some non-precedential cases in the Sixth Circuit suggest the officers' conduct was unlawful is not enough, particularly when other cases could support the opposite conclusion. *See Lane v. Franks*, ___ U.S. ___, 134 S. Ct. 2369, 2382–83 (2014) ("At best, Lane can demonstrate only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity.").

> *Rudlaff*, while also factually distinguishable from this case, is instructive on this point:
>
> The district court wrote that "this case do[es] not fall neatly into the[] categories" of clearly established taser law. That's a concession that it could find no clearly established constitutional violation, and the court should have stopped there—and held for the defendants. In fact, we have done the same in an excessive-force case that "does not fit cleanly within" our taser case law because qualified immunity operates in the hazy border between excessive and acceptable force. When in such a haze—as the district court said it was in here—the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight. The court erred in holding otherwise.

791 F.3d at 644 (quotations and citations omitted). That is the situation here. Although this Court finds Montgomery's conduct unconstitutional, his behavior "do[es] not fall neatly into the categories" of clearly established law governing the application of force to suspects reasonably believed to be resisting arrest.

Both the Supreme Court and the Sixth Circuit have repeatedly instructed that qualified immunity should be denied only where existing precedents place the answer to the constitutional question "beyond debate." *See, e.g.*, *White*, 137 S. Ct. at 551; *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015); *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016); *Rudlaff*, 791 F.3d at 643. This Court is unaware of any authority placing the constitutionality of Montgomery's conduct

"beyond debate."  While this Court does not approve of Montgomery's treatment of Stanfield, Montgomery is nonetheless entitled to qualified immunity.

### Officer Garman

Stanfield alleges Garman used excessive force by employing "muscling techniques" and applying two knee strikes (one of which broke Stanfield's rib) while Stanfield was on the ground. The analysis with respect to Garman largely mirrors that with respect to Montgomery.  As with Montgomery, it was objectively reasonable for Garman to use "muscling techniques" to try to gain control of Stanfield's hands once he refused to provide them for cuffing. *See Marvin*, 509 F.3d at 247. Thus, Garman's liability depends on the constitutionality of his knee strikes, which he inflicted after Stanfield was on the ground.

*Garman's knee strikes were excessive*

The first two *Graham* factors are the same with respect to Garman as they were with Montgomery -- Stanfield was suspected of a crime of moderate severity, and he was not a significant threat to himself, the officers, or anyone else at the time of his arrest.  And while Garman's force was arguably more severe than Montgomery's, given that it resulted in a broken rib, Stanfield's level of resistance was less ambiguous.  There is no question that, once he was on the ground, Stanfield actively resisted the officers' attempts to handcuff him.  Indeed, both the audio and the written transcript show the officers asked Stanfield to give them his hands several times before he was eventually cuffed (Doc. 35-1 at 198).

Arguably, given the less ambiguous resistance involved, Garman's conduct is more similar than Montgomery's to the conduct found constitutional in *Rudlaff* and *Caie*.  Yet, similar conduct was also found unconstitutional in *Lawler*, despite the suspect's resistance to being cuffed.  *See* 268 F. App'x at 387.  Ultimately, weighing all the *Graham* factors, this Court again is convinced the force

applied to Stanfield was unnecessarily severe and objectively unreasonable.  A reasonable officer would not have felt Stanfield's resistance to being cuffed -- after he was tackled without warning and lying face down on the ground -- warranted two knee strikes with enough force to break a man's ribs.  To be sure, Stanfield should not have refused to cooperate with the pat-down; nor should he have refused to produce his hands for cuffing.  But the totality of the circumstances did not warrant the level or manner of force applied.

*Qualified Immunity*

Garman, like Montgomery, is entitled to qualified immunity.  At the time of Stanfield's arrest, Sixth Circuit precedent did not (and still does not) clearly proscribe delivering knee strikes to non-violent suspects who are actively resisting arrest.  At best, there are discrepancies in the Sixth Circuit's opinions on the issue.  *Compare Rudlaff*, 791 F.3d at 639 ("When an arrestee actively resists arrest like [the suspect] did, the police can constitutionally use a taser *or a knee strike* to subdue him." (emphasis added)) *with Lawler*, 268 F. App'x at 387 ("[A] jury fairly could find that [the suspect] never posed a threat to [the officer's] safety (making [the officer's] take-down excessive) and could find that he was not a threat once he hit the floor (making [the officer's *knee strikes* and elbow jab gratuitous])." (emphasis added)).  Again, this is not enough to defeat qualified immunity.  *See Lane*, 134 S. Ct. at 2382–83 ("At best, Lane can demonstrate only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity.").

As with Montgomery, this Court does not condone Garman's conduct, and the facts of the cases cited above may be distinguishable from this one in meaningful ways.  But because the constitutionality of delivering two knee strikes to a subject resisting an arresting officer's attempt to cuff him was not "beyond debate," this Court must grant Garman qualified immunity.  *See White*, 137 S. Ct. at 551; *Rudlaff*, 791 F.3d at 643.

23

**Officer Rode**

Finally, Stanfield alleges Rode applied excessive force by striking him twice in the legs with a flashlight while he was on the ground.  This followed the force used by the other two officers.

*Rode's flashlight strikes were excessive*

Again, the first two *Graham* factors counsel against a severe use of force.  With respect to the third factor, Stanfield was clearly resisting the officers' attempts to restrain him before Rode struck him.  Nevertheless, Rode's force is distinguishable from Garman's in two key respects.  First, he used a flashlight rather than a knee strike.  Second, he struck Stanfield after Stanfield had responded to the officers' orders to give them his hands with the following statement: "I can't.  Quit (kneeing or beating) me.  God damn" (Doc. 35-1 at 198).

With respect to the first issue, Rode's conduct was not unconstitutional *merely* because he struck Stanfield with a flashlight.  This Court notes that Rode's use of the flashlight appears to be facially consistent with the Lima Police Department General Directives on the use of force, which provides that flashlights may be "used to assist an officer in gaining control of a resistive, threatening or combative subject," provided that "[o]fficers should not intentionally strike a blow to the head or neck . . . unless conditions are present which permit the use of deadly force" (Doc. 36-1 at 45).  Rode testified that he intentionally targeted "the meatiest part of [Stanfield's] calf" (Doc. 34-1 at 9).  This Court is unaware of any case clearly proscribing the use of a flashlight or baton against a resisting suspect where the strike was not to a critical area of the body (*e.g.*, the head, throat, neck, heart, or groin).  *Compare Jones v. City of Cincinnati*, 507 F. App'x 463, 467 (6th Cir. 2012) (holding that the use of batons on a resisting suspect was objectively reasonable and noting that the strikes were to non-critical areas of the suspect's body) *with Zuhl v. Haskins*, 652 F. App'x 358, 363 (6th Cir. 2016) (striking non-resisting suspect's face was objectively unreasonable); *Landis v. Baker*, 297 F. App'x

24

453, 461 (6th Cir. 2008) (striking non-resisting suspect ten times was objectively unreasonable); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (striking non-resisting suspect in the head and knee was objectively unreasonable).

Likewise, with respect to the second issue, the strikes were not objectively unreasonable *merely* because Stanfield told the officers he was unable to produce his hands moments before Rode struck him (Doc. 35-1 at 198). *See Goodrich*, 193 F. App'x at 556 ("Even assuming that [the suspect] had been incapacitated merely by the officers' tackling him, [the suspect] presents no evidence that such a fact was *clearly communicated* to the officers in the midst of the take-down.  Although [the suspect] states that he was not resisting the officers during the take-down, this subjective intent to cooperate, absent any evidence that he *clearly communicated* that intent to the officers and given the totality of the circumstances that would suggest an opposite intent, is insufficient to overcome the built-in measure of deference to the officer[s'] on-the-spot judgment about the level of force necessary." (emphasis added) (quotation omitted)); *but see Marvin*, 509 F.3d at 246 ("After being instructed to put his arms behind him, [the suspect] said he could not do so, at which point [the officer] exerted the force at issue here.  While [the suspect's] alleged physical disability weighs against [the officer's] actions, the fact remains that [the suspect] was resisting arrest.  Arguably [the suspect's] method of resisting could be characterized as passive such that the resistance was not so great as to require [the officer's] allegedly rough treatment.").

On the one hand, Stanfield's statement did not "clearly communicate" to the officers Stanfield's subjective intent to cooperate. *See Goodrich*, 193 F. App'x at 556.  On the other, Stanfield said "I can't," in response to the officers' commands to give them his hands.  It is unclear whether Stanfield was physically able to provide his hands for cuffing, given that his hands may have been trapped underneath him when he was tackled.  Regardless, in light of the circumstances -- including

25

Stanfield's age, weight, and position on the ground -- a reasonable officer would interpret the statement "I can't" as expressing an inability to comply with his command.  Thus, Stanfield's resistance at that point arguably became *passive*, calling into further question Rode's decision to strike Stanfield to obtain compliance.  *See Marvin*, 509 F.3d at 246.

Considering the totality of the circumstances, including the first two *Graham* factors, this Court finds Rode's flashlight strikes were excessive.  Stanfield did not pose a threat, he expressed an inability to comply with the officers commands, and he asked the officers to stop beating him.  Under the circumstances, a reasonable officer would conclude flashlight strikes were not warranted to effect an arrest.

### Qualified Immunity

As it was with respect to Montgomery and Garman, this Court is troubled by Rode's conduct.  Nevertheless, there again appears to be a lack of clear authority putting the constitutionality of Rode's conduct "beyond debate."  *See White*, 137 S. Ct. at 551; *Rudlaff*, 791 F.3d at 643.  As discussed above, a clear constitutional violation is not established merely by Rode's use of a flashlight on Stanfield's legs.  Nor is it established by Stanfield's saying "I can't," in light of *Goodrich* and *Marvin*.  Without clear authority establishing the unconstitutionality of Rode's conduct under the circumstances, Rode is entitled to qualified immunity.  *See White*, 137 S. Ct. at 552; *Rudlaff*, 791 F.3d at 644.

### MONELL LIABILITY

To prevail on a claim for municipal liability, Stanfield must show the alleged constitutional violation "occurred because of a municipal policy or custom."  *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Stanfield may make such a showing by demonstrating: "(1) the existence of an illegal official policy or legislative

26

enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* at 478. Stanfield, citing *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996), focuses on a custom-of-tolerance theory, arguing that Chief Martin and the City "cultivated a 'custom of tolerance or acquiescence' toward excessive force" that caused the officers to use excessive force against Stanfield (Doc. 40 at 9).

As *Doe* makes clear, a plaintiff seeking to prove a custom-of-tolerance claim must provide evidence "show[ing] that the need to act [was] so obvious that the [Police Department's] 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to" plaintiff's constitutional rights. *Doe*, 103 F.3d at 508. "'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an *obvious*, deliberate indifference to" unconstitutional conduct. *Id.* (emphasis added). Moreover, a custom-of-tolerance claim requires proof that there was a pattern of inadequately investigating similar claims. *Burgess*, 735 F.3d at 478. Plaintiff has shown neither deliberate indifference nor a failure to investigate.

Plaintiff points solely to a handful of investigations conducted by the Lima Police Department concerning allegations of excessive force against some of the officers involved in this case. Those allegations, however, were ultimately determined by the Police Department to be either inconclusive or unfounded. There is nothing in the record showing the investigations were inadequate. Further, there are no lawsuits establishing that the force used in any of those prior incidents was unconstitutionally excessive. Nothing in the investigatory documentation proves a use of force that was *obviously* unconstitutional. Thus, there is no evidence on which a reasonable jury could conclude the City acted indifferently toward an *obvious* "clear and persistent pattern" of unconstitutional

27

conduct.  Accordingly, Stanfield cannot meet his burden of showing a triable issue of fact on municipal liability.

But even if Stanfield could prove a claim against the City, Chief Martin would not be individually liable because he was not *directly* involved in the officers' unconstitutional conduct.  *See Bolden v. City of Euclid*, 595 F. App'x 464, 468 (6th Cir. 2014) ("The claim against Chief Brickman is properly addressed as a deliberate indifference claim against the City of Euclid, not against Chief Brickman personally."); *Harvey v. Campbell Cty.*, 453 F. App'x 557, 564 (6th Cir. 2011) ("Although plaintiffs have alleged undisputed facts tending to show that Harvey was subject to an unreasonable seizure, they have neither alleged facts nor adduced evidence that would support a finding that McClellan or Scott was personally involved in the shooting or approved of or acquiesced in the shooting.  It follows that McClellan and Scott can only be held liable in their official capacities and the action against them is properly deemed to be against the County."); *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("There is no allegation that any of these defendants directly participated, encouraged, authorized or acquiesced in the claimed [unlawful acts].").

## CONCLUSION

The record in this case leaves this Court with unanswered questions.  Plaintiff's recall is less than complete, and the sworn testimony does not present a uniform version of events.  Although the video is helpful, it is shot from a distance and does not show the necessary detail to resolve some discrepancies.  Couple this with Circuit caselaw that is not clear-cut, and this Court's decision becomes even more difficult.

To be sure, the officers' actions were excessive under the circumstances.  Stanfield did not present a genuine threat, and the officers were not faced with the sort of split-second decision that would ordinarily warrant deference to their judgment.  But Circuit caselaw and Supreme Court

28

instructions do not allow this Court to say their actions violated clearly established rights under the Constitution.  Indeed, excessive-force cases often involve distinguishing facts that place the situations confronted by officers into gray areas.  And the doctrine of qualified immunity shields officers from lawsuits based on decisions they make in those gray areas.  All of which is to say, Defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.

*s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 24, 2017